**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MONSTER ENERGY COMPANY, FKA Hansen Beverage Company, *Petitioner-Appellee*, | Nos. 17-55813 17-56082 |
| v. | D.C. No. 5:17-cv-00295-RGK-KK |
| CITY BEVERAGES, LLC, DBA Olympic Eagle Distributing, *Respondent-Appellant.* | OPINION |

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted July 12, 2019
Pasadena, California

Filed October 22, 2019

Before: MILAN D. SMITH, JR. and MICHELLE T.
FRIEDLAND, Circuit Judges, and MICHAEL H. SIMON,[*]
District Judge.

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge Friedland

---

[*] The Honorable Michael H. Simon, United States District Judge for the District of Oregon, sitting by designation.

## SUMMARY[**]

### Arbitration

The panel reversed the district court, vacated a final arbitration award between Monster Energy Co. and City Beverages LLC, doing business as Olympic Eagle Distributing, and vacated the district court's award of post-arbitration fees to Monster Energy Co. for its petition to confirm the award.

After Monster exercised its contractual right to terminate a distribution agreement, the parties proceeded to arbitration to determine whether Olympic Eagle was entitled to protection under Washington law, and thus whether Monster had improperly terminated the agreement without good cause.  The parties chose an arbitrator from a list of several neutrals provided by JAMS, the arbitration organization specified in the agreement.  At the outset of arbitration, the arbitrator provided a series of disclosure statements and in the final arbitration award, determined that Olympic Eagle did not qualify for protection under Washington law. Olympic Eagle sought to vacate the award based on later-discovered information that the arbitrator was a co-owner of JAMS—a fact that he did not disclose prior to arbitration.

The panel first rejected the claim that Olympic Eagle waived its evident partiality claim because it failed to timely object when it first learned of potential bias on the part of the arbitrator.  The panel held that because Olympic Eagle did

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

not have constructive notice of the arbitrator's potential non-neutrality, it did not waive its evident partiality claim.

The panel held that before an arbitrator is officially engaged to perform an arbitration, to ensure that the parties' acceptance of the arbitrator is informed, arbitrators must disclose their ownership interests, if any, in the arbitration organizations with whom they are affiliated in connection with the proposed arbitration, and those organizations' nontrivial business dealings with the parties to the arbitration. In this case, the arbitrator's failure to disclose his ownership interest in JAMS, coupled with the fact that JAMS has administered 97 arbitrations for Monster over the past five years, created a reasonable impression of bias and supported vacatur of the arbitration award. Because the panel vacated the arbitration award, the panel also vacated the district court's award of post-arbitration fees to Monster.

Dissenting, Judge Friedland disagreed that, in an evaluation of whether the arbitrator might favor Monster, the additional information the majority believed should have been disclosed would have made any material difference. She would therefore reject Olympic Eagle's effort to vacate the arbitration award in Monster's favor.

**COUNSEL**

Michael K. Vaska (argued), Rylan L.S. Weythman, and Devra R. Cohen, Foster Pepper PLLC, Seattle, Washington; Jonathan Solish and David A. Harford, Bryan Cave LLP, Irvine, California; for Respondent-Appellant.

Tanya M. Schierling (argued), Norman L. Smith, and Daniel E. Gardenswartz, Solomon Ward Seidenwurm & Smith LLP, San Diego, California, for Petitioner-Appellee.

Michael D. Madigan and Brandt F. Erwin, Madigan Dahl & Harlan P.A., Minneapolis, Minnesota, for Amicus Curiae National Beer Wholesalers Association.

## OPINION

M. SMITH, Circuit Judge:

City Beverages, LLC, doing business as Olympic Eagle Distributing (Olympic Eagle), and Monster Energy Co. (Monster) signed an agreement providing exclusive distribution rights for Monster's products to Olympic Eagle for a fixed term in a specified territory. After Monster exercised its contractual right to terminate the agreement, the parties proceeded to arbitration to determine whether Olympic Eagle was entitled to protection under Washington law, and thus whether Monster had improperly terminated the agreement without good cause. From a list of several neutrals provided by JAMS, the arbitration organization specified in the agreement, the parties chose the Honorable John W. Kennedy, Jr. (Ret.) (the Arbitrator). At the outset of arbitration, the Arbitrator provided a series of disclosure statements. In the final arbitration award (the Award), the Arbitrator determined that Olympic Eagle did not qualify for protection under Washington law.

The parties filed cross-petitions in the district court, with Monster seeking to confirm the Award and Olympic Eagle moving to vacate it. The district court ultimately confirmed the Award.

We conclude, given the Arbitrator's failure to disclose his ownership interest in JAMS, coupled with the fact that JAMS has administered 97 arbitrations for Monster over the past five years, that vacatur of the Award is necessary on the ground of evident partiality. We therefore reverse the district court and vacate the Award. We also vacate the district court's award of post-arbitration fees to Monster for its petition to confirm the Award.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual Background

In 2006, Olympic Eagle, an Anheuser-Busch (AB) distributor, agreed to promote and sell Monster energy drinks for twenty years in an exclusive territory. The contract permitted Monster to terminate the agreement without cause upon payment of a severance fee. Eight years later, Monster exercised its termination right and offered to pay Olympic Eagle the contractual severance of $2.5 million.

In response, Olympic Eagle invoked Washington's Franchise Investment Protection Act (FIPA), which prohibits termination of a franchise contract absent good cause. *See* Wash. Rev. Code § 19.100.180(2)(j). Monster served an arbitration demand on Olympic Eagle and filed an action in the district court seeking to compel arbitration. The district court ruled in favor of Monster and compelled arbitration before JAMS Orange County, as specified by Monster in its form agreement with the AB distributors.

JAMS provided a list of seven neutrals to conduct the arbitration, and the parties chose the Arbitrator. The Arbitrator's multi-page disclosure statement, provided to the

parties at the commencement of arbitration, contained the following provision:

> I practice in association with JAMS. Each JAMS neutral, including me, has an economic interest in the overall financial success of JAMS. In addition, because of the nature and size of JAMS, the parties should assume that one or more of the other neutrals who practice with JAMS has participated in an arbitration, mediation or other dispute resolution proceeding with the parties, counsel or insurers in this case and may do so in the future.

## II.  Procedural Background

Following two weeks of hearings, the Arbitrator issued an interim award, finding that Olympic Eagle was not entitled to protection under FIPA. Two months later, the Arbitrator awarded Monster attorneys' fees (together with the interim award, the Award).

Thereafter, Monster filed a petition in the district court to confirm the Award, and Olympic Eagle cross-petitioned for its vacatur. Olympic Eagle sought to vacate the Award based on later-discovered information that the Arbitrator was a co-owner of JAMS—a fact that he did not disclose prior to arbitration. Olympic Eagle also requested information from JAMS regarding the Arbitrator's financial interest in JAMS, and Monster's relationship with JAMS. When JAMS refused to divulge this information, Olympic Eagle served JAMS with a subpoena. In the face of further resistance, Olympic Eagle later moved to compel JAMS's response to the subpoena.

Ultimately, the district court confirmed the Award, denying Olympic Eagle's cross-petition and finding its motion to compel moot.  The district court then awarded Monster attorneys' fees from both the arbitration and the post-arbitration proceedings.  Judgment was entered, and Olympic Eagle timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over this appeal pursuant to 9 U.S.C. § 16 and 28 U.S.C. § 1291, and we review de novo the district court's confirmation of an arbitration award. *New Regency Prods., Inc. v. Nippon Herald Films, Inc.*, 501 F.3d 1101, 1105 (9th Cir. 2007).

## ANALYSIS

The Federal Arbitration Act permits a court to vacate an arbitration award "where there was evident partiality . . . in the arbitrators."  9 U.S.C. § 10(a)(2).[1]  Olympic Eagle seeks vacatur of the Award based on the Arbitrator's failure to fully disclose his ownership interest in JAMS.  Monster contends that the district court correctly found Olympic Eagle's argument waived, and, alternatively, that the Arbitrator's disclosures were sufficient.  We first consider

---

[1] Our dissenting colleague makes much of the fact that persons who litigate their claims in arbitration have voluntarily given up the extensive protections afforded to parties by the conflict of interest statutes and rules governing federal judges. However, she fails to similarly credit the fact that federal law also provides some comparable protections to parties in arbitration by also permitting courts to vacate arbitration awards when there is "evident partiality . . . in the arbitrators."  9 U.S.C. § 10(a)(2); *see infra* Section II.

whether Olympic Eagle waived its evident partiality claim, and, finding that it did not, then turn to the merits.

## I.  Waiver

The district court held, and Monster continues to argue, that Olympic Eagle waived its evident partiality claim because it failed to timely object when it first learned of potential "repeat player" bias and the Arbitrator disclosed his economic interest in JAMS.

In *Fidelity Federal Bank, FSB v. Durga Ma Corp.* (*Fidelity*), we joined several of our sister circuits that utilize a constructive knowledge standard when considering whether a party has waived an evident partiality claim. 386 F.3d 1306, 1313 (9th Cir. 2004).  There, we held that the disgruntled party was on notice that the challenged arbitrator may have been non-neutral given the process the parties employed to pick their arbitration panel: each party picked one arbitrator and the arbitrators picked the third.  *Id.* Moreover, the party had failed to request disclosures from the arbitrator or object to the lack of disclosures.  *Id.*  Given these facts, we concluded that the party had waived its partiality objection.  *Id.*

Our post-*Fidelity* waiver cases involved less complicated factual scenarios than the case before us.  *See Johnson v. Gruma Corp.*, 614 F.3d 1062, 1069 (9th Cir. 2010) (finding waiver where the party knew for at least "a year or two" of the prior professional relationship between the arbitrator and opposing counsel's spouse before the arbitrator ruled); *Metalmark Nw., LLC v. Stewart*, No. 06-35321, 2008 WL 11442024, at *1 (9th Cir. May 6, 2008) (finding no waiver because the arbitrator failed to disclose conflicts and neither party had selected the arbitrator). Unlike these prior cases, the situation here is more akin to a

partial disclosure—the Arbitrator disclosed his "economic interest" in JAMS prior to arbitration, but Olympic Eagle did not know it was an ownership interest. Although the district court correctly noted that an ownership interest is "merely a type of economic interest," the key issue is whether Olympic Eagle had constructive notice of the Arbitrator's potential non-neutrality.

We find that Olympic Eagle lacked the requisite constructive notice for waiver. To be sure, it knew that the Arbitrator had some sort of "economic interest" in JAMS. But the Arbitrator expressly likened his interest in JAMS to that of "each JAMS neutral," who has an interest in the "overall financial success of JAMS." The Arbitrator also disclosed his previous arbitration activities that directly involved Monster, in which he ruled against the company. In context, these disclosures implied only that the Arbitrator, like any other JAMS arbitrator or employee, had a general interest in JAMS's reputation and economic wellbeing, and that his sole financial interest was in the arbitrations that he himself conducted. Thus, even if the number of disputes that Monster sent to JAMS was publicly available, that information alone would not have revealed that this *specific* Arbitrator was potentially non-neutral based on the totality of JAMS's Monster-related business.

The crucial fact—the Arbitrator's ownership interest—was not unearthed through public sources, and it is not evident that Olympic Eagle could have discovered this information prior to arbitration. In fact, JAMS repeatedly stymied Olympic Eagle's efforts to obtain details about JAMS' ownership structure and the Arbitrator's interest post-arbitration. Accordingly, Olympic Eagle did not have constructive notice of the Arbitrator's ownership interest in JAMS—the key fact that triggered the specter of partiality.

Furthermore, we have repeatedly emphasized an arbitrator's duty to investigate and disclose potential conflicts. *See, e.g.*, *New Regency*, 501 F.3d at 1110–11 (holding that the arbitrator's new employment triggered duty to investigate possible conflicts). The Arbitrator undoubtedly knew of his ownership interest in JAMS prior to arbitration yet failed to disclose it. To find waiver in this circumstance would "'put a premium on concealment' in a context where the Supreme Court has long required full disclosure." *Tenaska Energy, Inc. v. Ponderosa Pina Energy, LLC*, 437 S.W. 3d 518, 528 (Tex. 2014) (quoting *Middlesex Mut. Ins. Co. v. Levine*, 675 F.2d 1197, 1204 (11th Cir. 1982)). Thus, we hold that Olympic Eagle did not have constructive notice of the Arbitrator's potential non-neutrality, and therefore did not waive its evident partiality claim.

## II. Evident Partiality

The Supreme Court has held that vacatur of an arbitration award is supported where the arbitrator fails to "disclose to the parties any dealings that might create an impression of possible bias." *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 149 (1968). In a concurrence, Justice White noted that when an arbitrator has a "substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed," *id.* at 151–52 (White, J., concurring)—a formulation of the rule that we have adopted. *See, e.g.*, *New Regency*, 501 F.3d at 1107. By contrast, we have observed that "long past, attenuated, or insubstantial connections between a party and an arbitrator" do not support vacatur based on evident partiality. *Id.* at 1110; *see also Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 646 (9th Cir. 2010) (finding no evident partiality where the

arbitrator's alleged ethical misconduct "occurred more than a decade before th[e] arbitration and concerned neither of the parties to the case").

In *New Regency*, we considered an arbitrator's failure to disclose his new employment as an executive at a film group that was negotiating with one of the party's executives for the development of a movie. 501 F.3d at 1107, 1111. Prior to the arbitration, the arbitrator disclosed only that he had "negotiated deals" with that same party's leadership, but failed to update his disclosures once the new employment began. *Id.* at 1106. Because the film deal was "real and nontrivial," we found a "reasonable impression of partiality [] sufficient to support vacatur." *Id.* at 1110–11. Similarly, in *Schmitz v. Zilveti*, we vacated an arbitration award for evident partiality where the arbitrator's law firm had represented the parent company of one party in "at least nineteen cases during a period of 35 years." 20 F.3d 1043, 1044 (9th Cir. 1994). Thus, under our case law, to support vacatur of an arbitration award, the arbitrator's undisclosed interest in an entity must be substantial, *and* that entity's business dealings with a party to the arbitration must be nontrivial.

Here, the Arbitrator submitted a disclosure statement in accordance with JAMS's rules. He disclosed that within the past five years he had served as a neutral arbitrator for one of the parties, firms, or lawyers in the present arbitration; that within the past two years he or JAMS had been contacted by a party or an attorney regarding prospective employment; and that he "practice[s] in association with JAMS. Each JAMS neutral, including me, has an economic interest in the overall financial success of JAMS." The Arbitrator also disclosed that he arbitrated a separate dispute between Monster and a distributor, resulting in an award against

Monster of almost $400,000.  He did *not*, however, disclose his ownership interest in JAMS and JAMS's substantial business relationship with Monster.

Our inquiry is thus two-fold: we must determine (1) whether the Arbitrator's ownership interest in JAMS was sufficiently substantial, *and* (2) whether JAMS and Monster were engaged in nontrivial business dealings.  If the answer to both questions is affirmative, then the relationship required disclosure, and supports vacatur.

First, as a co-owner of JAMS, the Arbitrator has a right to a portion of profits from *all* of its arbitrations, not just those that he personally conducts.  This ownership interest—which greatly exceeds the general economic interest that all JAMS neutrals[2] naturally have in the organization—is therefore substantial.  Second, Monster's form contracts contain an arbitration provision that designates JAMS Orange County as its arbitrator.  As a result, over the past five years, JAMS has administered 97 arbitrations for Monster: an average rate of more than one arbitration per month.  Such a rate of business dealing is hardly trivial, regardless of the exact profit-share that the Arbitrator obtained.[3]    In sum, these facts demonstrate that the

---

[2] Indeed, only about one-third of JAMS neutrals are owner-shareholders.

[3] Although the record does not reveal the Arbitrator's specific monetary interest in Monster-related arbitrations, we do not require such empirical evidence to conduct the triviality inquiry.  *See New Regency*, 501 F.3d at 1111 (finding that a "high-profile" project was not unimportant, even though "the record [did] not allow us to place a dollar value" on it); *Schmitz*, 20 F.3d at 1044, 1048 (finding generally that an arbitrator's *firm's* representation on nineteen cases in 35 years resulted in impression of impartiality).

Arbitrator had a "substantial interest in [JAMS,] which has done more than trivial business with [Monster]"—facts that create an impression of bias, should have been disclosed, and therefore support vacatur.  *Commonwealth Coatings*, 393 U.S. at 151–52 (White, J., concurring).

We acknowledge that previous cases did not address an arbitrator's interest in his own arbitration service. Nonetheless, the Court did not distinguish between an arbitrator's organization and other entities, nor do we see any reason to insulate arbitration services from the principles that the Court articulated *Commonwealth Coatings*.

Some states within our circuit have already legislated extensive requirements for neutral arbitrators to ensure full disclosure.   In California, for example, arbitrators are required to disclose "all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be impartial," including the "existence of any ground specified in [Cal. Civ. Proc. Code § 170.1] for disqualification of a judge."  Cal. Civ. Proc. Code § 1281.9(a).    Similarly, Montana requires arbitrators to disclose "all matters that could cause a person aware of the facts underlying a potential conflict of interest to have a reasonable doubt that the person would be able to act as a neutral or impartial arbitrator," including any ground for the disqualification of a judge.  Mont. Code Ann. §§ 27-5-116(3)–(4).

In addition, under the Revised Uniform Arbitration Act (the RUAA), which has been adopted by several states in our circuit, an arbitrator must disclose "any known facts that a reasonable person would consider likely to affect the impartiality of the arbitrator," including a financial interest in the outcome of the proceeding. *See, e.g.*, Or. Rev. Stat. Ann. § 36.650(1)(1).    The RUAA also establishes a

presumption of evident partiality when the arbitrator does not disclose a "known, direct and material interest in the outcome of the arbitration proceeding or a known, existing and substantial relationship with a party . . . ." *See, e.g.*, Ariz. Rev. Stat. Ann. § 12-3012(E).

In the states that have enacted the referenced measures, arbitrators currently operate under disclosure rules akin to, or more burdensome than, the easily satisfied obligations we set forth here. Fundamentally, these disclosure requirements safeguard the parties' right to be aware of the relevant information to assess the arbitrator's neutrality.

We note that although judges are bound by somewhat different rules than arbitrators, judges are clearly not immune from recusal requirements when our neutrality might be reasonably questioned. *See, e.g.*, *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009) ("The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'"); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927) (holding that the Due Process Clause requires recusal when a judge has a "direct, personal, substantial pecuniary interest" in a case). Unlike the standards governing judges, however, our ruling in this case does not require automatic disqualification or recusal—only disclosure prior to conducting an arbitration concerning (1) the arbitrator's ownership interest, if any, in the entity under whose auspices the arbitration is conducted, *and* (2) whether the entity under whose auspices the arbitration is conducted and one or more of the parties were previously engaged in nontrivial business dealings. Once armed with that information, and the answers to any other inquiries the parties may wish to pose as a result of knowing that information, the parties can make their own

informed decisions about whether a particular arbitrator is likely to be neutral.  It is simplicity itself, and no real burden, for an arbitrator to disclose his or her ownership interest in an arbitration company for which he or she works, as well as the organization's prior dealings with the parties to the arbitration.

Although this litigation involved two sophisticated companies, the proliferation of arbitration clauses in everyday life—including in employment-related disputes, consumer transactions, housing issues, and beyond—means that arbitration will often take place between unequal parties. *See* Katherine Van Wezel Stone, *Rustic Justice: Community and Coercion Under the Federal Arbitration Act*, 77 N.C. L. Rev. 931, 934 (1999); *see also Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors, LLC*, 913 F.3d 1162, 1169 (9th Cir. 2019) (noting, "We have become an arbitration nation.").  Clear disclosures by arbitrators aid parties in making informed decisions among potential neutrals.  These disclosures are particularly important for one-off parties facing "repeat players."  *See* Lisa B. Bingham, *Employment Arbitration: The Repeat Player Effect*, 1 Emp. Rts. & Emp. Pol'y J. 189, 209–17 (1997) (finding that employees disproportionately failed to recover damages against repeat-player employers compared to non-repeat-player employers).

Ultimately, we agree with Justice White:

> The arbitration process functions best when an amicable and trusting atmosphere is preserved and there is voluntary compliance with the decree, without need for judicial enforcement.  This end is best served by establishing an atmosphere of frankness at the outset, through disclosure by the

> arbitrator of any financial transactions which he has had or is negotiating with either of the parties. . . .   The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality.   That role is best consigned to the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business.

*Commonwealth Coatings*, 393 U.S. at 151 (White, J., concurring).

In accordance with the interest of finality, judicial review of arbitration awards is often unexacting.   However, the Supreme Court has nonetheless clearly endorsed the judicial enforcement of an arbitrators' duty to disclose.   Placing the onus on arbitrators to disclose their ownership interests in their arbitration organizations, and their organizations' nontrivial business dealings with the parties to the arbitration, is consistent with both the principles of *Commonwealth Coatings* and our court's precedents.

Although our dissenting colleague raises concerns about the finality of recent arbitral judgments in light of our ruling in this case, she correctly notes that the applicable statute of limitations to vacate an arbitration award, *which is only three months*, will limit the impact of our ruling on recently decided arbitrations.   9 U.S.C. § 12; *Stevens v. Jiffy Lube Int'l, Inc.*, 911 F.3d 1249, 1251–52 (9th Cir. 2018). Prospectively, arbitration organizations like JAMS, which are already well-accustomed to extensive conflicts checks and disclosures, will have no difficulty fulfilling, and even exceeding, the requirements described here.

## CONCLUSION

As the *Commonwealth Coatings* Court stated, "We can perceive no way in which the effectiveness of the arbitration process will be hampered by the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias." 393 U.S. at 149. We thus hold that before an arbitrator is officially engaged to perform an arbitration, to ensure that the parties' acceptance of the arbitrator is informed, arbitrators must disclose their ownership interests, if any, in the arbitration organizations with whom they are affiliated in connection with the proposed arbitration, and those organizations' nontrivial business dealings with the parties to the arbitration.

Here, the Arbitrator's failure to disclose his ownership interest in JAMS—given its nontrivial business relations with Monster—creates a reasonable impression of bias and supports vacatur of the arbitration award. Because we vacate the arbitration award, we also vacate the district court's award of post-arbitration fees to Monster.[4]

**REVERSED and VACATED.**

---

[4] We further deny Olympic Eagle's request to take judicial notice and grant Monster's request to take judicial notice. We deny the amicus motions filed by the Legal Academics and Eric Kripke. We find moot the amicus motion filed by Warner Bros. We grant the amicus motion filed by the National Beer Wholesalers Association, finding it relevant and useful. *See* Fed. R. App. P. 29(a)(3)(B).

FRIEDLAND, Circuit Judge, dissenting:

The majority vacates the arbitration award for "evident partiality" because the Arbitrator failed to disclose that he had an ownership interest in JAMS. In the majority's view, this undisclosed fact was necessary for the parties' informed selection of this Arbitrator because it creates an impression that differs meaningfully from that created by the facts the Arbitrator did disclose: (1) that he had a financial interest in JAMS's success generally, and (2) that Monster was a repeat customer of JAMS. I disagree that, in an evaluation of whether the Arbitrator might favor Monster, the additional information the majority believes should have been disclosed would have made any material difference. I would therefore reject Olympic Eagle's effort to vacate the arbitration award in Monster's favor.

## I.

The Framers of our Constitution built protections against judicial partiality into Article III. Federal judges have life tenure and may not have their salaries diminished while in office. U.S. Const. art. III, § 1. As federal employees, federal judges receive their salaries from the government, not from the parties who appear before them. These structural protections are designed to help ensure that federal judges will decide cases based on the law and the facts, not out of concern about remaining popular enough to be selected to decide the next case or to receive the next paycheck. *See* The Federalist No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (explaining that Article III's provision of life tenure is meant "to secure a steady, upright, and impartial administration of the laws").

When parties like those here, who could have their disputes resolved in federal court, instead have entered into

a contract that requires resolving any disputes in private arbitration (whether the arbitration term was desired by both parties or not), they have given up those Article III protections. *See Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 679 (7th Cir. 1983) (explaining that parties to a commercial arbitration have "cho[sen] their method of dispute resolution, and can ask no more impartiality than inheres in the method they have chosen"). By nature of the fact that arbitrators are hired and paid by the parties for whom they conduct private arbitrations, arbitrators have an economic stake in cultivating repeat customers for their services. In addition, arbitrators affiliated with an arbitration firm have an interest in not causing the firm to lose its top clients. At least to some extent, this means arbitrators have incentives to make decisions that are viewed favorably by parties who frequently engage in arbitrations.[1] This feature of private arbitration, even if distressing, is an inevitable result of the structure of the industry.

In this case, the Arbitrator disclosed that he had a financial interest in JAMS's success. He further disclosed that he had personally conducted one arbitration in which Monster was a party and had been selected to decide another case involving Monster and a different distributor. And he made clear that "the parties should assume that one or more of the other neutrals who practice with JAMS has participated in [a] . . . dispute resolution proceeding with the parties . . . in this case and may do so in the future." Olympic Eagle also knew that Monster used a form contract with its hundreds of distributors requiring that disputes be resolved

---

[1] Individual arbitrators may be able to put these incentives out of their minds and make impartial decisions, but the incentives exist nonetheless.

through arbitration before JAMS—and therefore had even more reason to know that Monster had likely hired other JAMS arbitrators or at least had the potential to do so in the future.[2]  Indeed, the parties had litigated about the form contract, and the district court had held that Olympic Eagle had validly agreed to its terms, a ruling Olympic Eagle has not appealed.  And before the arbitration began, Olympic Eagle could easily have accessed an online record showing that JAMS had conducted dozens of arbitrations between Monster and its consumers.[3]  *See Consumer Case Information*, JAMS, https://www.jamsadr.com/consumerca ses/ (last visited Oct. 11, 2019); *see also* Cal. Code Civ. Proc. § 1281.96 (requiring arbitration companies to disclose information about their consumer arbitrations).

This was more than enough information to allow Olympic Eagle to consider whether the Arbitrator might

---

[2] It is unclear the extent to which a JAMS arbitrator would have had a similarly strong incentive to please Olympic Eagle, itself a large beverage distribution company.  There appears to be nothing in the record that indicates whether Olympic Eagle was a repeat customer of JAMS or how frequently it engages in arbitrations.  But it is possible that a JAMS arbitrator would have had an incentive to please the lawyers representing Olympic Eagle, given that lawyers often help their clients choose arbitrators.  According to a court filing submitted by Monster, an international law firm that helped represent Olympic Eagle in this dispute with Monster had represented parties in at least twenty-three other cases involving arbitration with JAMS.

[3] As of August 27, 2015—when JAMS sent Monster and Olympic Eagle a list of potential arbitrators—JAMS had disclosed on its website at least eighty-one arbitrations involving Monster.  *Consumer Case Information*, JAMS, https://web.archive.org/web/20150506072558/ http://www.jamsadr.com/files/Uploads/Documents/JAMS-Consumer-Case-Information.xlsx (May 6, 2015) (accessed by searching for "http://www.jamsadr.com/files/Uploads/Documents/JAMS-Consumer-Case-Information.xlsx" in the Internet Archive Wayback Machine).

have had an incentive to try to please Monster and thereby keep its repeat arbitration business. The majority reasons, however, that the Arbitrator's interest as a JAMS owner should have been specifically disclosed because it "greatly exceeds the general economic interest that all JAMS neutrals naturally have in the organization." Maj. Op. at 12. I do not see how this information would have made a material difference in Olympic Eagle's evaluation of the Arbitrator. Owners of JAMS have an interest in maximizing JAMS's amount of business, because they share in JAMS's profits. Likewise, non-owner arbitrators have an interest in advancing their professional careers and maintaining their status with JAMS, which creates similar incentives to decide cases in a way that is acceptable to repeat player customers—otherwise, JAMS might terminate the non-owner's JAMS affiliation.

Notably, by the time the Arbitrator was being selected, Olympic Eagle had committed to resolving any dispute with Monster through arbitration at JAMS. This necessarily meant that Olympic Eagle agreed the arbitration would be conducted by a JAMS arbitrator, whether that arbitrator was an owner of JAMS or a non-owner of JAMS. Because both types of arbitrators would have at least some incentive to keep repeat customers of JAMS such as Monster happy, it is unclear why knowing the details of the financial relationship between any specific potential arbitrator and JAMS would make a material difference to whether that arbitrator was accepted by Olympic Eagle.[4] That an arbitrator has an

---

[4] The majority also highlights that the Arbitrator failed to disclose more concrete information about Monster's past use of JAMS. Maj. Op. at 12. To the extent the majority believes this nondisclosure further supports vacating the arbitration award, *compare* Maj. Op. at 12 (noting the Arbitrator did not disclose "JAMS's substantial business relationship

ownership interest in the arbitration firm, not just a financial interest in that firm more generally, is hardly the sort of "real" and "not trivial" undisclosed conflict that our court has held requires vacatur. *See New Regency Prods., Inc. v. Nippon Herald Films, Inc.*, 501 F.3d 1101, 1110 (9th Cir. 2007) (quotation marks omitted).

The majority also leaves unclear how detailed an arbitrator's disclosures must be. Is it enough to reveal the fact that the arbitrator is an owner, or must the arbitrator disclose information such as how large the ownership interest is? Is it necessary to disclose the arbitration firm's total profits from the prior year—or maybe each year in the prior decade—so parties may assess, for example, whether the business of the party in question is significant overall? And how many prior arbitrations must a corporation have engaged in with an arbitration firm for there to be "nontrivial business dealings," Maj. Op. at 14, that require disclosure?[5]

---

with Monster"), *with* Maj. Op. at 17 (emphasizing "the Arbitrator's failure to disclose his ownership interest in JAMS," and the existence of JAMS's "nontrivial business relations with Monster," but not mentioning the Arbitrator's nondisclosure of those "business relations"), I disagree. Given that owners and non-owners have similar incentives to favor repeat players, the extent of a repeat player's relationship with the firm as a whole—which would not vary from arbitrator to arbitrator— would be of little help in deciding whether to choose any particular arbitrator. And even if the Arbitrator did not disclose precise details, he *did* disclose that Monster was a repeat customer.

[5] The majority indicates that generally, if an arbitrator has an ownership interest in his firm, and his firm has significant prior dealings with a party, both pieces of information must be disclosed. It is unclear, however, whether the majority's approach requires an arbitrator to disclose significant prior dealings even if he has no ownership interest, and vice-versa. *Compare* Maj. Op. at 17 (stating that "arbitrators must disclose their ownership interests, *if any*" and their firm's "nontrivial

Does the fee paid for each of these prior arbitrations need to exceed any threshold to trigger disclosure? And, because lawyers often choose or help choose arbitrators, giving arbitrators an incentive to please lawyers who bring clients to arbitrations, must prior arbitrations with the lawyers or law firms representing the parties also be disclosed?

As these lingering questions demonstrate, ruling for Olympic Eagle is likely to generate endless litigation over arbitrations that were intended to finally resolve disputes outside the court system. Nothing in existing caselaw forces this error. Olympic Eagle has not pointed us to a single reported federal decision holding that an undisclosed potential source of bias stemming from the structure of the private arbitration industry itself warrants vacating an arbitration award. The majority acknowledges as much by conceding that there are no prior cases directly on point. Rather, the precedent binding us that vacated arbitration awards because of a failure to disclose information involved an arbitrator who had a relationship with one of the arbitrating parties that was totally unrelated to prior arbitrations. *See Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 146, 149–50 (1968) (arbitrator failed to disclose that he had occasionally served as an engineering consultant for one of the parties over several years); *New Regency Prods.*, 501 F.3d at 1107–11 (arbitrator failed to disclose his employment with a company negotiating a film deal with one of the parties to the arbitration); *Schmitz v. Zilveti*, 20 F.3d 1043, 1044, 1048–50 (9th Cir. 1994) (arbitrator failed to disclose that his law firm represented in at least nineteen matters a parent company of one of the

business dealings with the parties to the arbitration" (emphasis added)), *with* Maj. Op. at 12 (suggesting that disclosure is only required if there is both an ownership interest and substantial business dealings).

parties to the arbitration).   There is no reason the parties
would know about the potential partiality arising from such
a relationship unless the arbitrator disclosed the relationship.
By contrast, the potential partiality that stems from the very
structure of private arbitration is obvious to anyone who
understands arbitrators' general economic interest in repeat
business for themselves or their firm.

In the short run, adopting Olympic Eagle's position will
require vacating awards in numerous cases decided by
JAMS owners (who make up about a third of JAMS
arbitrators) who did not disclose their ownership interest.[6] If
there are other firms where arbitrators similarly hold
ownership interests, the majority's approach will likewise
require vacatur in those arbitrators' cases with repeat players
unless there was a disclosure of the ownership interest.

In the long run, adopting Olympic Eagle's position could
spur years of quibbling over the extent of disclosures
required by arbitrators.  And this slippery slope may have no
bottom.  If the losing party to an arbitration is less of a repeat
player than its opponent, it will likely be able to think up
after the fact some argument that an arbitrator's disclosure
did not fully convey the arbitrator's financial interest in the
potential future arbitration business of the winning party or
its lawyers.  The result will be to prolong disputes that both
parties have already spent tremendous amounts of time and
money to resolve.   Olympic Eagle, for example, only

---

[6] Of course, the statute of limitations for filing a motion to vacate an
arbitration award may place a limit on how much litigation there will be.
*See* 9 U.S.C. § 12; *Stevens v. Jiffy Lube Int'l, Inc.*, 911 F.3d 1249, 1251–
52 (9th Cir. 2018) (discussing statute of limitations for petitions to vacate
arbitration awards).

objected to the Arbitrator's lack of disclosure after it lost the arbitration. By that point, more than a year had passed since the district court compelled arbitration, and the agreed-upon Arbitrator had conducted a hearing lasting nine days. The arbitration fee alone was $160,000, and Monster was awarded $3 million in attorney's fees and costs.[7] To avoid the uncertainty created by the majority's opinion, which would inevitably exist even after further disclosures are attempted, parties may shift to using arbitrators who are unaffiliated with any arbitration firm. These arbitrators may be less likely to have expertise—but be at least equally likely to want to retain the business of potential repeat customers. *Cf. ANR Coal Co., Inc. v. Cogentrix of N.C., Inc.*, 173 F.3d 493, 498–99 (4th Cir. 1999) ("[S]ubjecting arbitrators to extremely rigorous disclosure obligations would diminish one of the key benefits of arbitration: an arbitrator's familiarity with the parties' business." (citing *Commonwealth Coatings*, 393 U.S. at 150 (White, J., concurring))).

Although I would affirm the Arbitrator's award in favor of Monster, I note that lack of disclosure about a party's prior arbitrations might require vacatur in some instances. For

---

[7] Ruling for Olympic Eagle could also lay the groundwork for further disputes over whether arbitrators with ownership interests have a conflict that disqualifies them under state law from arbitrating cases involving a repeat player. *See* Cal. Code Civ. Proc. § 1281.91(d) (allowing for disqualification under certain circumstances, including those described in Cal. Code Civ. Proc. § 170.1(a)(6)(A)(iii)—when "[a] person aware of the facts might reasonably entertain a doubt that the [decision-maker] would be able to be impartial"); *see also* Alaska Stat. § 09.43.380(b) ("An individual who has a known, direct, and material interest in the outcome of the arbitration proceeding . . . may not serve as an arbitrator required by an agreement to be neutral."); Ariz. Rev. Stat. Ann. § 12-3011(B) (same); Haw. Rev. Stat. § 658A-11(b) (same); Nev. Rev. Stat. § 38.226(2) (same).

example, if one of the parties had used the exact same arbitrator to resolve numerous disputes, and the arbitrator always ruled in its favor, vacatur might be appropriate based on the arbitrator's failure to disclose that arbitration history. But the facts of this case are nowhere near so extreme. The Arbitrator had previously decided one dispute between Monster and a distributor, and that proceeding resulted in an award of almost $400,000 *against* Monster. The Arbitrator had also been selected to decide a dispute between Monster and another distributor, which was still pending at the time of the arbitration involving Monster and Olympic Eagle. The disclosure the Arbitrator made to the parties provided accurate information about both arbitrations.

## II.

To the extent that the private arbitration system favors repeat players, I think it is unfortunate that so many parties forgo the protections of Article III and turn to arbitration instead. It is especially unfortunate when arbitrations involve a non-repeat player party that had no choice but to agree to arbitration in order to acquire employment, purchase a product, or obtain a necessary service. The majority laudably seeks to mitigate disparities between repeat players and one-shot players in the arbitration system. But I disagree that requiring disclosures about the elephant that everyone knows is in the room will address those disparities. It will only cause many arbitrations to be re-done, and endless litigation over how many repeated arbitrations there will be.

I therefore respectfully dissent.