Filed 4/19/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| STEVEN M. SPEIER, | G059216 |
| Plaintiff, Cross-defendant and Appellant, | (Super. Ct. No. 30-2017-00956650) |
| v. | O P I N I O N |
| THE ADVANTAGE FUND, LLC, et al., | |
| Defendants, Cross-complainants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, James Di Cesare, Judge. Affirmed.

Law Office of William B. Hanley and William B. Hanley for Plaintiff, Cross-defendant and Appellant.

O'Melveny & Myers, Michael G. Yoder and Brandon C. Amash for Defendants, Cross-complainants and Respondents.

\*                \*                \*

## INTRODUCTION

Exercising de novo review, we affirm the trial court's judgment entered after the trial court granted a motion to confirm an arbitration award and denied a motion to vacate that award. The applicable statute states that an award can only be vacated for a failure to disclose if the arbitrator "failed to disclose . . . a ground for disqualification." (Code Civ. Proc., § 1286.2, subd. (a)(6)(A).)[1] Appellant contends the arbitrator failed to make required disclosures. Appellant does not contend the arbitrator was actually biased. The sole basis for the appeal is the argument the arbitrator did not disclose information that could cause a reasonable person aware of the facts to entertain a doubt that the arbitrator would be able to be impartial.

The arbitration involved claims by a former investment fund manager and his former employers, namely, the investment funds. All parties were sophisticated and engaged in a business—not consumer—dispute. Both the fund manager and the investment funds were represented by large law firms—Alston & Bird for the fund manager and O'Melveny & Myers for the investment funds. Both law firms were frequent users of the services of the ADR provider, JAMS; they each had 245 matters before JAMS in the five-year period preceding this arbitration.

We explain in detail in this opinion how the arbitrator and JAMS made extensive prearbitration disclosures. The motion to vacate was based on the sole ground that the arbitrator did not disclose the extent of JAMS's "business relationship" with O'Melveny & Myers and the arbitrator's ownership interest in JAMS (not more than .1 percent of total revenue in a given year).

Based on the facts and circumstances shown by this record, and applying the analytical framework we discuss, we hold that the arbitrator's and JAMS's disclosures were sufficient, and the arbitrator was not required to disclose more

_____

[1] All further statutory references are to the Code of Civil Procedure unless otherwise specified.

2

information about the extent of JAMS's business with O'Melveny & Myers, or the arbitrator's own ownership interest in JAMS. There is no issue of a repeat party or lawyer being favored over a non-repeat party or lawyer; the parties in this business dispute are sophisticated; and the law firms were both frequent users of JAMS to the same extent.

*        *        *

Before addressing the merits in detail, we will make some observations of the big picture to give context to our decision.

First and foremost, the issues of disqualification and disclosure are vitally important to the integrity of decisions and the decision-making process. (See Rothman, Fybel, MacLaren & Jacobson, Cal. Jud. Conduct Handbook (4th ed. 2017) § 7:1, p. 387.)

Second, the extent to which a disclosure is required is considered under an objective standard depending on the facts of each case. Hence, the test focuses on a reasonable person aware of the facts. As a result, there is no bright-line rule and, in another case, the type of disclosures we conclude were not required here may be required, depending on the facts of that case.

Third, disclosures are required where a reasonable, informed person could entertain a doubt about the impartiality of the arbitrator. Significantly, "[a]ll the possible things that might be of interest to litigants and lawyers are not things which would be considered, in reason," to be relevant to the question of disqualification. (Rothman et al., Cal. Jud. Conduct Handbook, *supra*, § 7:74, p. 496.) The statutes and ethical standards governing arbitrator disqualification upon which this appeal is based do not require the disclosure of information other than that which could cause a person aware of all the facts to reasonably question the prospective arbitrator's impartiality. None of the relevant statutes and ethical standards provides that an arbitrator would be disqualified for failing to disclose information outside of the reasonable person standard.

3

Fourth, under the relevant terms of the statute governing vacation of arbitration awards, the award could only be vacated and not confirmed if the arbitrator "failed to disclose . . . a ground for disqualification." (§ 1286.2, subd. (a)(6)(A).) Under the governing statutes and ethical standards, required disclosures are limited to matters reasonably related to disqualification. (See Rothman et al., Cal. Jud. Conduct Handbook, *supra*, § 7:17, p. 414, citing Code Civ. Proc., §§ 170.1-170.5 & Cal. Code Jud. Ethics, canon 3E(2)(a).) Here, that ground of disqualification is whether the arbitrator was required to disclose additional facts that could or might cause a person aware of the facts to reasonably entertain a doubt the arbitrator could not be impartial.

Fifth, and finally, simply because a matter may not seem to be required to be disclosed by an arbitrator does not mean the arbitrator should not disclose the matter. Indeed, disclosure may cause a meaningful discussion to better inform the arbitrator on the question of disqualification. (Rothman et al., Cal. Jud. Conduct Handbook, *supra*, § 7:73, p. 495.)

# FACTUAL AND PROCEDURAL BACKGROUND[2]

## I.

### THE FUNDS AND THEIR INVESTMENT MANAGERS

The Advantage Fund, LLC, the Discovery Fund, LLC, the Freedom Fund, LLC, and the Victory Fund, LLC (collectively, the Funds) invested in portfolios of commercial office buildings. Entities formed by David Colton (the Colton entities) served as the original fund manager for the Funds. After many years, the Funds' shareholders and investors became dissatisfied with the Funds' performance and filed lawsuits against the Colton entities. In 2013, certain of the asserted claims were

---

[2] The facts summarized in this section are taken from the final arbitration award and the parties' counsel's declarations filed in connection with their respective motions to confirm and vacate the award.

4

submitted to arbitration.  During the pendency of that arbitration, in March 2015, the Funds' shareholders elected Steven M. Speier as the new fund manager.

About two years later, and in accordance with a settlement agreement between the Colton entities and shareholders of the Funds, the shareholders agreed to cooperate in removing Speier as fund manager and restoring the Colton entities to that role for the Funds.  Speier received written notice of his removal for cause.

In July 2017, Speier sent the Funds a letter alleging he was entitled to shareholder distribution payments and backend interest payments in the Funds' profits. The Funds principally asserted that Speier had taken a shareholder distribution payment, improperly appointed himself president of the Funds, and paid himself a salary for performing the same duties as fund manager.

## II.

### INITIATION OF ARBITRATION BETWEEN SPEIER AND THE FUNDS

After the parties unsuccessfully attempted to agree on an arbitrator to resolve their disputes, Speier filed a petition in the trial court to compel arbitration and for an order appointing an arbitrator.  The trial court granted the petition and nominated five retired judges from the list of potential arbitrators submitted by the parties to serve as arbitrator.  The court ordered that either the parties agree to one of the five nominees, or the court would select an arbitrator from that list.  The parties failed to stipulate to an arbitrator before the court's deadline and the court thereafter appointed the Honorable Gail A. Andler (Ret.) (the arbitrator) from that list to serve as the arbitrator.  Later that month, Speier filed his demand for arbitration with JAMS, asserting claims against the

Funds for breach of operating agreements, breach of the implied covenant of good faith and fair dealing, declaratory relief, and an accounting.

## III.

### PREARBITRATION DISCLOSURES

JAMS and the arbitrator provided the parties with disclosures under (1) sections 170.1, 1281.6, 1281.85, 1281.9, 1281.95, and 1297.121, (2) the California Rules of Court Ethics Standards for Neutral Arbitrators in Contractual Arbitration (the Ethics Standards), and (3) JAMS Ethical Guidelines for Arbitrators. As relevant to the issues on appeal, the disclosures included the arbitrator's statement: "I practice in association with JAMS. Each JAMS neutral, including me, has an economic interest in the overall financial success of JAMS. In addition, because of the nature and size of JAMS, the parties should assume that one or more of the other neutrals who practice with JAMS has participated in an arbitration, mediation or other dispute resolution proceeding with the parties, counsel or insurers in this case and may do so in the future."

The arbitrator further disclosed that, within the preceding five years, she had served as a neutral arbitrator in other matters involving a party, a lawyer for a party, or law firm for a party to the current arbitration. JAMS provided the parties with reports showing matters involving the arbitrator and Speier, Speier's arbitration counsel (Alston & Bird), the Funds, and the Funds' arbitration counsel (O'Melveny & Myers). Those reports showed the arbitrator had a then-open mediation involving attorneys from Alston & Bird who were not involved in the instant arbitration, one then-open mediation involving two attorneys from O'Melveny & Myers who were also serving as the Funds' counsel in the instant arbitration, and one then-open arbitration involving attorneys from O'Melveny & Myers who were not involved in the instant arbitration. No party filed any objection to the arbitrator's assignment.

## IV.

### THE ARBITRATION

The Funds filed a response to Speier's statement of claims and asserted their counterclaims against Speier for declaratory relief, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, corporate waste, and unjust enrichment.

Following nine days of an arbitration hearing, in June 2019, the arbitrator issued an interim award which denied Speier relief on his claims and awarded the Funds damages in the amount of $353,183.93 plus prejudgment interest. The arbitrator also found the Funds to be the prevailing parties and invited the Funds to submit an application for attorney fees and costs. Speier did not object to the interim award. The Funds submitted an application for attorney fees and costs, Speier opposed the application, and the Funds replied. Speier thereafter retained new counsel, William B. Hanley, and requested the opportunity to submit a supplemental opposition; the arbitrator granted the request.

In August 2019, the arbitrator issued the final arbitration award which stated the Funds had established their counterclaims and were entitled to a principal award (which included prejudgment interest) in the amount of $433,117.23, plus an award of $2,112,974.03 for attorney fees and $157,709.87 in costs.

## V.

### MOTIONS TO CONFIRM AND VACATE THE AWARD

In November 2019, the Funds filed a motion in the trial court seeking an order confirming the final arbitration award and entry of final judgment. Hanley sent a letter to JAMS requesting for the first time "information relating to the following: (1) ownership interest of [the arbitrator] in JAMS and (2) the number of arbitrations JAMS has had with O'Melveny & Myers in the past five (5) years."

7

In response, JAMS sent Hanley a letter stating the arbitrator is "an owner panelist of JAMS" and added that "[o]wners are not privy to information regarding the number of cases or revenue related to cases assigned to other panelists. Shareholders receive no information regarding any potential impact on distributions by any particular client, lawyer, or law firm. Shareholders do not receive credit for the creation or retention of client relationships."

As to Hanley's second request, JAMS's response letter stated: "We have not limited our response to the O'Melveny firm. Instead, we enclose a report that provides JAMS usage history for all of the firms, lawyers, and parties in this matter for the five years prior to commencement of this arbitration." The enclosed report showed, as reported by the trial court in its minute order confirming the award, that in the preceding five years, JAMS administered 58 arbitrations, 27 references, and 160 mediations, for a total of 245 matters, involving O'Melveny & Myers, and 36 arbitrations, 18 court references, and 191 mediations, for a total of 245 matters, involving Alston & Bird; no party objected in the trial court or challenges on appeal the court's summary of the report.

The report also stated: "JAMS administers approximately 13,000 cases per year," defined as any case in which JAMS receives a payment, regardless of which party or parties paid. The report further stated: "JAMS has approximately 400 neutrals on its panel, and a little over one quarter of JAMS neutrals have an equal ownership share in the company. Owners are not privy to information regarding the number of cases or revenue related to cases assigned to other panelists. No shareholder's distribution has ever exceeded 0.1% of JAMS total revenue in a given year. Shareholders are not informed about how their profit distributions are impacted by any particular client, lawyer or law firm and shareholders do not receive credit for the creation or retention of client relationships."

8

Speier filed an opposition to the motion to confirm the final award and a motion to vacate the final award that were both based solely on the ground the arbitrator failed to make material disclosures required by sections 1286.2, subdivision (a)(6)(A), 1281, 170.1, and the Ethics Standards by failing to disclose her ownership in JAMS and the amount of business JAMS has conducted with O'Melveny & Myers.

Following a hearing, the trial court denied the motion to vacate and confirmed the final arbitration award. Judgment was entered in favor of the Funds and against Speier in conformity with the final award in the amount of $433,117.23, plus attorney fees in the amount of $2,112,974.03, and costs in the amount of $157,709.87. Speier appealed.

## DISCUSSION

### I.

### OVERVIEW OF AN ARBITRATOR'S DUTY TO DISCLOSE MATTERS THAT COULD OR MIGHT CAUSE A PERSON AWARE OF THE FACTS TO REASONABLY ENTERTAIN A DOUBT THAT THE ARBITRATOR WOULD BE ABLE TO BE IMPARTIAL.

### A.

### The California Arbitration Act

"The California Arbitration Act (§ 1280 et seq.) 'represents a comprehensive statutory scheme regulating private arbitration in this state.' [Citation.] The statutory scheme reflects a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' [Citation.] '[I]t is the general rule that parties to a private arbitration impliedly agree that the arbitrator's decision will be both binding and final.'" (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 380 (*Haworth*).)

Because a court may not generally review the merits of an arbitration award, parties to an arbitration agreement assume some risk of an erroneous decision by the arbitrator. (*Haworth, supra*, 50 Cal.4th at p. 380.) The Legislature has reduced that

9

risk by providing for judicial review when there are "'serious problems with the award itself, or with the fairness of the arbitration process.'" (*Ibid.*) The grounds for judicially vacating an arbitration award, however, are strictly limited by statute. As relevant to this case, section 1286.2, subdivision (a)(6)(A) requires the trial court to vacate an arbitration award by an arbitrator who "failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware."

Section 1281.9, subdivision (a) requires arbitrators to disclose "all matters that could cause *a person aware of the facts to reasonably* entertain a doubt that the proposed neutral arbitrator would be able to be impartial." (Italics added.) Section 1281.9 provides a list of matters to be disclosed which includes the "existence of any ground specified in Section 170.1 for disqualification of a judge" (*id.*, subd. (a)(1)), "matters required to be disclosed by the ethics standards for neutral arbitrators adopted by the Judicial Council" (*id.*, subd. (a)(2)), and "the names of the parties to all prior or pending noncollective bargaining cases *in which the proposed neutral arbitrator* served or is serving as a party arbitrator for any party to the arbitration proceeding or for a lawyer for a party and the results of each case arbitrated to conclusion, including the date of the arbitration award, identification of the prevailing party, the names of the parties' attorneys and the amount of monetary damages awarded, if any" (*id.*, subd. (a)(3), italics added).

Section 170.1, subdivision (a)(6)(A)(iii) mandates disqualification of a judge when a "person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." Standard 7(d) of the Ethics Standards requires arbitrators to disclose, among other things, "all matters that could cause *a person aware of the facts to reasonably entertain a doubt* that the arbitrator would be able to be impartial, including, but not limited to," as cited by Speier in his opening brief, "(15) Any other matter that: [¶] (A) Might cause a person aware of the facts to *reasonably entertain a doubt* that the arbitrator would be able to be impartial." (Ethics Standards, std.

10

7(d)(15)(A), italics added.) In his opening brief, Speier also cites standard 9, which states: "A person who is nominated or appointed as an arbitrator must make a reasonable effort to inform himself or herself of matters that must be disclosed under standards 7 and 8." (*Id.*, std. 9(a).)

## B.

### The Objective, Reasonable Person Standard

"'The "reasonable person" is not someone who is "hypersensitive or unduly suspicious," but rather is a "well-informed, thoughtful observer."' [Citations.] '[T]he partisan litigant emotionally involved in the controversy underlying the lawsuit is not the *disinterested objective observer* whose doubts concerning the judge's impartiality provide the governing standard.' [Citations.] [¶] 'An impression of possible bias in the arbitration context means that one could reasonably form a belief that an arbitrator was biased *for or against a party for a particular reason*.'" (*Haworth, supra*, 50 Cal.4th at p. 389.)[3]

The reasonable person standard is objective: "Courts apply an objective test in determining whether under section 1281.9, subdivision (a) neutral arbitrators must disclose matters that could reasonably cause a person aware of the facts to entertain a doubt that the proposed arbitrator would be impartial. [Citation.] The 'objective test . . . focuses on a reasonable person's perception of bias and does not require actual bias.' [Citation.] Accordingly, we are not concerned with the subjective question of whether the arbitrator was actually biased, but whether an objective, reasonable person aware of the facts reasonably could entertain a doubt that he could be impartial in the

---

[3] The California Supreme Court noted: "In interpreting a comparable provision of the federal law requiring recusal of a judge when his or her 'impartiality might reasonably be questioned' [citation], federal courts have stated that the appearance-of-partiality 'standard "must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice."'" (*Haworth, supra*, 50 Cal.5th at p. 389.)

11

case." (*Malek Media Group, LLC v. AXQG Corp.* (2020) 58 Cal.App.5th 817, 828, citing *Haworth, supra*, 50 Cal.4th at pp. 385-386.)

## II.

### STANDARD OF REVIEW

Here, the facts are not in dispute. The Supreme Court in *Haworth, supra*, 50 Cal.4th at page 385, under similar circumstances, stated that whether the arbitrator was required to make certain disclosures is "a mixed question of fact and law that should be reviewed de novo." The Supreme Court explained: "We conclude that employment of a de novo standard of review for issues concerning arbitrator disclosure will assist in ensuring both consistency in the law and finality of arbitration awards, without sacrificing accuracy in those determinations." (*Id.* at p. 388.)

## III.

### UNDER THE CIRCUMSTANCES OF THIS CASE, NEITHER THE ARBITRATOR'S OWNERSHIP INTEREST IN JAMS NOR THE EXTENT OF JAMS'S BUSINESS WITH O'MELVENY & MYERS COULD OR MIGHT CAUSE A REASONABLE PERSON AWARE OF THE FACTS TO ENTERTAIN A DOUBT THAT THE ARBITRATOR WOULD BE ABLE TO BE IMPARTIAL.

Speier's challenge to the final arbitration award is not based on either the contention the arbitrator failed to disclose any information specifically required to be disclosed by the Code of Civil Procedure or Ethics Standards, or the contention the arbitrator was in fact biased. Instead, Speier's challenge is limited to the argument the award must be vacated because the arbitrator failed to disclose information that raises a doubt about the arbitrator's impartiality within the meaning of sections 170.1, subdivision (a)(6)(A)(iii) and 1281.9, subdivision (a), and standard 7 of the Ethics Standards. Speier relies solely on his contention the arbitrator's ownership interest in JAMS and JAMS's

12

prior business relationship with O'Melveny & Myers was required to have been disclosed under this category.

It is undisputed that the arbitrator offered a complete disclosure of her current and prior dealings with the parties, the parties' attorneys, and the parties' attorneys' law firms in this case.

If this were a consumer case, which all parties agree it was not, standard 8 of the Ethics Standards would apply to require the type of disclosures Speier argues should have been made here. Standard 8, entitled "Additional disclosures in consumer arbitrations administered by a provider organization," requires at subpart (b) that in a consumer arbitration,[4] the arbitrator must disclose "[a]ny significant past, present, or currently expected financial or professional relationship or affiliation between the administering dispute resolution provider organization and a party or lawyer in the arbitration." In consumer arbitrations, standard 8(c) further requires the arbitrator also to

---

[4]  The term "Consumer arbitration" is defined in standard 2(d) as "an arbitration conducted under a predispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below . . . [¶] (1) The contract is with a consumer party, as defined in these standards; [¶] (2) The contract was drafted by or on behalf of the nonconsumer party; and [¶] (3) The consumer party was required to accept the arbitration provision in the contract." A "Consumer party," in turn, is defined in standard 2(e) as "a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

"(1) An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;

"(2) An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;

"(3) An individual with a medical malpractice claim that is subject to the arbitration agreement; or

"(4) An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement."

13

provide information regarding "[a]ny financial relationship or affiliation the arbitrator has with the provider organization other than receiving referrals of cases, including whether the arbitrator has a financial interest in the provider organization or is an employee of the provider organization."

Standard 8(a)(2) has this important proviso: "An arbitrator is *not* required to make the disclosures required by this standard if he or she reasonably believes that the arbitration is not a consumer arbitration based on reasonable reliance on a consumer party's representation that the arbitration is not a consumer arbitration." (Italics added.)[5] Therefore, contrary to Speier's argument that the arbitrator's ownership interest in JAMS and the extent of JAMS's prior business matters with O'Melveny & Myers automatically constitute information that must be disclosed by an arbitrator, standard 8(a)(2) makes clear such information is not subject to mandatory disclosure in nonconsumer arbitrations.

We next consider whether such disclosures were nevertheless required because, under the specific facts and circumstances of this case, the information could reasonably raise a doubt in a person aware of the facts about the arbitrator's impartiality. There are no facts or circumstances in our record, and Speier does not point to any, that show how the arbitrator's receipt a distribution of not more than .1 percent of JAMS's total revenue in a given year in any way favors one party or party's law firm over the other.

---

[5] Speier tacitly admits in his opening brief that a disclosure of the extent of JAMS's business relationships with a law firm involved in an arbitration is not automatically required in the nonconsumer context under California law. Speier argues: "It should be incumbent on the dispute resolution provider organization who is coordinating, administering, or providing arbitration services to disclose to all parties in writing any significant past, present, or currently expected financial or professional relationship or affiliation between the administering dispute organization provider not only with the parties or the individual lawyer for the parties but also the law firms. Such a rule exits in consumer arbitrations (Ethics Standards 8 (b) [&] (d); CCP § 1281.92). It should be part of commercial arbitrations as well." (Underlining omitted.)

14

The parties' arbitration attorneys are from law firms that had the same number of matters before JAMS in the five years prior to the arbitrator's assignment to this case. Therefore, the information Speier contends should have been known and disclosed by the arbitrator, whether considered independently or collectively as a whole, does not reasonably raise a doubt about the arbitrator's impartiality. As the arbitrator did not fail to make a required disclosure, and Speier offers no other challenges to the arbitration award, the trial court did not err by denying Speier's motion to vacate, confirming the final award, and entering judgment accordingly. (See *Rivera v. Shivers* (2020) 54 Cal.App.5th 82, 89 ["Where a party files a petition to confirm an arbitration award pursuant to section 1285 et seq., 'the court shall confirm the award as made' unless it 'vacates the award or dismisses the proceeding.' (§ 1286.)"].)

At oral argument, Speier's counsel focused on the words "might" and "could" in the authorities. His argument, unfortunately, ignored three fundamental principles that apply to the analysis. First, it reads out the legal express concepts of a "person aware of the facts" and a "reasonable" person.

Second, Speier's argument ignores the context of the statutes and ethics standards upon which he relies, which provide for the *disqualification* of a prospective arbitrator based on his or her failure to make a *required* disclosure under the code. (See § 1281.91, subd. (a) ["A proposed neutral arbitrator *shall be disqualified* if he or she fails to comply with Section 1281.9"], italics added; § 1286.2, subd. (a)(6) [an arbitration award shall be vacated if the arbitrator failed to "disclose . . . a ground for *disqualification*" or the arbitrator "was *subject to disqualification* upon grounds specified in Section 1281.91 but failed upon receipt of timely demand to disqualify himself or herself as required by that provision"], italics added; Ethics Standards, std. 7(a) ["This standard is intended to identify the matters that *must* be disclosed by a person nominated or appointed as an arbitrator"], italics added.) These statutes and standards do not provide for the disclosure of any additional information a party might find relevant to its

determination whether to select a particular arbitrator, much less the invalidation of an arbitration award based on the failure to make such a disclosure.

Third, at oral argument, Speier's counsel argued that even at the postarbitration award stage of the case, Speier had an absolute right to disqualify the arbitrator because of information the arbitrator did not disclose. To review, in order to vacate an arbitration award based on a disclosure Speier wanted to have been made by the arbitrator, the arbitrator had to have failed to disclose "a ground for disqualification." (§ 1286.2, subd. (a)(6)(A).) Speier once had the right to disqualify "one court-appointed arbitrator without cause in any single arbitration" after the arbitrator made disclosures under section 1281.9, but any such challenge to the arbitrator's appointment had to be made within 15 calendar days after service of the disclosure statement (§ 1281.91, subd. (b)).

Speier did not make such a challenge during the statutorily proscribed time frame. He did not make his challenge until after the Funds sought to confirm the arbitration award. Section 1281.91, subdivision (c) provides that except as provided in subdivision (d),[6] "in no event may a notice of disqualification be given *after a hearing of any contested issue of fact* relating to the merits of the claim or after any ruling by the arbitrator regarding any contested matter. (Italics added.) At the procedural stage of opposing the Funds' motion to confirm the arbitration award, and while moving to have the award vacated, Speier had to show the omitted disclosures were disqualifying within the meaning of the governing statutes and ethics standards as a matter of law. For the reasons discussed *ante*, he did not.

---

[6] Subdivision (d) of section 1281.91 provides that if a ground for disqualification specified under section 170.1 exists, "a neutral arbitrator shall disqualify himself or herself upon the demand of any party made *before the conclusion of the arbitration proceeding*." (Italics added.)

16

The statutory treatment of challenges to disclosures makes sense. If a party is dissatisfied with an actual disclosure that is made by the arbitrator, the party has an absolute one-time right to disqualify the arbitrator within 15 days. If a party challenges confirmation and seeks to vacate an award already made because of a claim a disclosure was not made, the party must show that such disclosure would have required disqualification. This Legislature's solution balances a party's right to disqualify an arbitrator based on disclosures actually made against a party's remedy if the party believes a disclosure must have been made but was not. Section 1286.2, subdivision (a)(6)(A)'s requirement that the absent disclosure would have otherwise been disqualifying is consistent with the rule that any error must be prejudicial to support reversal.

## IV.

### CASES RELIED ON BY SPEIER

### A.

### *Monster Energy Co. v. City Beverages, LLC*

Speier heavily relies on the Ninth Circuit decision in *Monster Energy Co. v. City Beverages, LLC* (9th Cir. 2019) 940 F.3d 1130 (*Monster Energy*). While that opinion bears some similarities to the instant case, it is inapposite to the facts before us.

In *Monster Energy*, Anheuser-Busch distributor, Olympic Eagle, agreed to sell Monster Energy drinks for 20 years in an exclusive territory. (*Monster Energy, supra*, 940 F.3d at pp. 1132-1133.) When a dispute arose between the parties, Monster Energy filed an action in the district court seeking to compel arbitration of the dispute pursuant to Monster Energy's form agreement with its distributors, including Olympic Eagle. (*Id.* at p. 1133.) The district court ordered arbitration before JAMS Orange County. (*Ibid.*) The parties agreed on an arbitrator from a list of seven proposed arbitrators provided by JAMS. (*Ibid.*) The selected arbitrator disclosed, among other things, like the arbitrator here, that he had an economic interest in the overall financial

17

success of JAMS, and "because of the nature and size of JAMS, the parties should assume that one or more of the other neutrals who practice with JAMS has participated in an arbitration, mediation or other dispute resolution proceedings with the parties, counsel or insurers in this case and may do so in the future." (*Ibid.*)

The arbitrator issued an interim award in favor of Monster Energy. (*Monster Energy, supra*, 940 F.3d at p. 1133.) After Monster Energy filed a petition to confirm the award, Olympic Eagle cross-petitioned for its vacatur on the ground the arbitrator had failed to disclose he was a co-owner of JAMS and Monster Energy's business relationship with JAMS. (*Ibid.*) The district court confirmed the award and Olympic Eagle appealed. (*Ibid.*)

The majority in *Monster Energy* framed the issues presented in this way: "Our inquiry is thus two-fold: we must determine (1) whether the Arbitrator's ownership interest in JAMS was sufficiently substantial, and (2) whether JAMS and Monster were engaged in nontrivial business dealings. If the answer to both questions is affirmative, then the relationship required disclosure, and supports vacatur." (*Monster Energy, supra*, 940 F.3d at p. 1136.) The majority held that the arbitrator's right to a portion of profits from all JAMS arbitrations was substantial. (*Ibid.*) The majority observed: "Monster's form contracts contain an arbitration provision that designates JAMS Orange County as its arbitrator. As a result, over the past five years, JAMS has administered 97 arbitrations for Monster: an average rate of more than one arbitration per month. Such a rate of business dealing is hardly trivial, regardless of the exact profit-share that the Arbitrator obtained. In sum, these facts demonstrate the Arbitrator had a 'substantial interest in [JAMS,] which has done more than trivial business with [Monster]'—facts that create an impression of bias, should have been disclosed, and therefore support vacatur." (*Ibid.*, fn. omitted.)

*Monster Energy, supra*, 940 F.3d 1130 is inapposite to the instant case for several reasons. First, *Monster Energy* is a federal court decision interpreting federal law

18

and does not rely upon any California statute, Ethics Standards, or case law. (See *Nagel v. Twin Laboratories, Inc.* (2003) 109 Cal.App.4th 39, 55 ["'federal decisional authority is neither binding nor controlling in matters involving state law'"].)

Second, the most glaring differences are that Monster Energy was a *party* to the dispute, had appeared before JAMS repeatedly, and had JAMS written into its arbitration agreement. None of those facts is present here. The arbitration provision in the operating agreements did not require the use of or even suggest any particular arbitrator or arbitration provider. Furthermore, it was Speier, not the Funds, who moved to compel the arbitration of the parties' disputes and for an order appointing an arbitrator in this case.

Finally and significantly, the majority opinion concluded that Monster Energy's repeat business with JAMS, which included 97 matters in the previous five years, was nontrivial, and that that nontrivial business history, coupled with the arbitrator's ownership stake in JAMS, triggered the duty to disclose. (*Monster Energy, supra*, 940 F.3d at p. 1136.) Conspicuously absent from the opinion is any reference to Olympic Eagle's prior business dealings with JAMS, if any. (*Id.* at p. 1140, fn. 2 (dis. opn.) ["There appears to be nothing in the record that indicates whether Olympic Eagle was a repeat customer of JAMS or how frequently it engages in arbitrations"].) In the absence of such information, the majority opinion in *Monster Energy* implicitly assumes Olympic Eagle had little if any such prior business dealings with JAMS. The majority expressed concern that disclosures of prior business dealings "are particularly important for one-off parties facing 'repeat players.' See Lisa B. Bingham, Employment Arbitration: The Repeat Player Effect, 1 Emp. Rts. & Emp. Pol'y J. 189, 209-17 (1997) (finding that employees disproportionately failed to recover damages against repeat-player employers compared to non-repeat-player employers)." (*Id.* at p. 1138, italics omitted.)

19

Here, Speier's and the Funds' arbitration counsel's respective law firms had significant business involvement with JAMS and had had an equal number of matters before it in the preceding five-year period. So even if we were to adopt Monster Energy's "nontrivial" business dealings disclosure standard, on our record, the degree of each law firm's business dealings with JAMS was nontrivial in relation to the other. And, of course, here there is no contention of undisclosed repeat business by a party.

**B.**

### *Advantage Medical Services, LLC v. Hoffman*

Speier argues that the arbitrator was not excused from disclosing her ownership interest in JAMS or JAMS's business history with O'Melveny & Myers because she was unaware of it. In support of his argument, Speier cites *Advantage Medical Services, LLC v. Hoffman* (2008) 160 Cal.App.4th 806 (*Advantage*). *Advantage* is also inapplicable to the instant case.

In *Advantage, supra*, 160 Cal.App.4th at page 809, the defendants sought an order disqualifying the arbitrator and vacating an arbitration award after they had learned that the arbitrator and his law firm had represented several protection and indemnity clubs (P&I Clubs) which procured reinsurance support from syndicates of Lloyd's of London (Lloyd's) and that Lloyd's also had insured one of the plaintiffs in the arbitration. The arbitrator had granted that plaintiff's request to permit a representative from its insurer to attend the arbitration without requiring the plaintiff to disclose to the defendants, or apparently even to the arbitrator, the identity of that representative or the insurer itself. (*Id.* at p. 818.)

Substantial evidence identified in detail in the opinion showed the significant contacts and relationships between the arbitrator and his law firm to Lloyd's— the arbitrator would have been required to disclose such information had he known the identity of the representative or the insurer itself. (*Advantage, supra*, 160 Cal.App.4th at p. 819.) The arbitrator, however, denied the defendants' requests for disclosure of the

20

identity of the insurer and/or the insurer's representative who was present during the arbitration. (*Id.* at p. 818.) Even after the arbitrator had learned the identity of the Lloyd's coverage counsel, he did not make any disclosures about his professional relationship with Lloyd's; "[c]onspicuously absent from the record is evidence of any disclosure by [the arbitrator] regarding his or [his law firm's] involvement with Lloyd's in representing P&I Club clients." (*Ibid.*) The arbitrator later denied he or his law firm ever represented a syndicate of Lloyd's but did not address whether he or his law firm had any other business relationship with or connection to Lloyd's members or syndicates other than an attorney-client relationship. (*Id.* at p. 818.)

Noting the "unusual and striking circumstances triggering defendants' argument [the arbitrator] violated his disclosure obligations," a panel of this court in *Advantage, supra*, 160 Cal.App.4th 806 held the trial court did not err by vacating the arbitration award because (1) the arbitrator had a duty, mandated by section 1281.85, subdivision (a), through its incorporation of standard 9(a) of the Ethics Standards,[7] to inquire about the identity of the plaintiff's insurer's representative; (2) the arbitrator had a mandatory obligation under section 1281.9 to disclose his and his law firm's involvement with Lloyd's; (3) the arbitrator's failure to inquire did not excuse his failure to make mandatory disclosures; and (4) the information that the arbitrator failed to disclose "'could cause a person aware of the facts to reasonably entertain a doubt that [the arbitrator] would be able to be impartial.'" (*Id.* at pp. 818-819.)

In *Advantage, supra*, 160 Cal.App.4th 806, the arbitrator's failure to inquire at least contributed to the arbitrator's failure to make mandatory disclosures under the relevant law. Here, even if we were to assume the arbitrator had had a duty to make inquiries about her ownership status with JAMS and about JAMS's business relationship

---

[7] Standard 9(a) states: "A person who is nominated or appointed as an arbitrator must make a reasonable effort to inform himself or herself of matters that must be disclosed under standards 7 and 8."

with O'Melveny & Myers during the five years preceding arbitration, any failure to make such inquiries was harmless because, for the reasons discussed *ante*, such information could not cause a reasonable person aware of the facts to doubt the impartiality of the arbitrator.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover costs on appeal.

FYBEL, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

GOETHALS, J.